UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

```
_____
                                    )
CROSBY LEGACY COMPANY, LLC,         )
d/b/a PHILIP CROSBY ASSOCIATES,     )
                                    )
        Plaintiff,                  )
                                    )
            v.                      )
                                    )       Civil Action No. 18-10814-MLW
                                    )
TECHNIPFMC PLC,                     )
                                    )
        Defendant.                  )
_____)
```

<u>REPORT AND RECOMMENDATION ON MOTION TO DISMISS</u>
[Docket No. 8]

September 13, 2019

Boal, M.J.

 Plaintiff Crosby Legacy Company, LLC, d/b/a Philip Crosby Associates ("PCA") alleges that defendant TechnipFMC plc improperly used PCA materials, thereby breaching agreements between the parties, committing fraud and violating intellectual property laws.  TechnipFMC has moved to dismiss the complaint in its entirety.  Docket No. 8.[1]  For the following reasons, this Court recommends[2] that the District Judge grant in part and deny in part that motion.

I. <u>PROCEDURAL HISTORY</u>

 On April 26, 2018, PCA filed its complaint, which contains nine causes of action: count I - breach of the "Executory Amended and Restated License Agreement" ("2017 email

---

[1] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket. They reference the docket number assigned by CM/ECF, and include pincites to the page numbers appearing in the top right corner of each page within the header appended by CM/ECF.
[2] On July 24, 2019, the District Judge referred the instant motion to the undersigned for a report and recommendation.  Docket No. 20.

exchange"); count II - breach of the January 1, 2014 License Agreement ("2014 License Agreement"); count III - breach of the implied covenant of good faith and fair dealing with respect to the 2017 email exchange; count IV - fraud/intentional misrepresentation; count V - violation of M.G.L. c. 93A, § 11; count VI - violation of Lanham Act/trademark infringement, 15 U.S.C. § 1114; count VII - violation of Lanham Act/15 U.S.C. § 1125(a); count VIII - copyright infringement, 17 U.S.C. § 501, et seq.; and count IX - unjust enrichment.  Docket No. 1 ("Compl.").

On July 2, 2018, TechnipFMC filed its motion to dismiss, which PCA opposed.  Docket Nos. 8, 15.  TechnipFMC filed a reply brief.  Docket No. 19.  This Court heard oral argument on August 28, 2019.  On September 12, 2019, PCA filed a supplemental brief.  Docket No. 28.

II.      COMPLAINT[3]

A.  Parties

PCA is a limited liability company with a principal place of business in Boston, Massachusetts.  Compl. ¶ 1.  Its sole member is a citizen of Massachusetts.  Id.  Founded by Philip Crosby, PCA works with client organizations to integrate "principles of quality" into the management and operation of their businesses.  Id. ¶¶ 8-10.  Through implementation of its methods and with strategic guidance by its quality management professionals, PCA alleges that it helps clients reduce inefficiencies and achieve substantial cost savings.  Id. ¶ 13.

 PCA's materials and services contain trademarks, including "Absolutes of Quality Management," "Absolutes of Quality" and the "Price of Nonconformance" (collectively, the

---

[3] Because this case is presently before this Court on a motion to dismiss, this Court sets forth the facts taking as true all well-pleaded allegations in the complaint and drawing all reasonable inferences in PCA's favor.  See Morales-Tañon v. P.R. Electric Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

"PCA marks").  Id. ¶ 14.  The cornerstone of Philip Crosby's philosophy is his "Absolutes of Quality Management," which is the foundation of PCA's approach to implementing and maintaining quality in every aspect of a business' operations.  Id. ¶ 9.  PCA also owns federally registered copyrights in Crosby's published works, including the titles "Quality is Free," "Quality is Still Free," "Quality Without Tears," "The Absolutes of Leadership" and the "The Eternally Successful Organization: The Art of Corporate Wellness."  Id. ¶ 135.  PCA's licensed materials include, but are not limited to, direct use of these copyrighted works as well as any derivative works.  Id. ¶ 136.

FMC was a provider of equipment and services for clients in the exploration and production of oil and gas energy sources.  Id. ¶ 22.

Defendant TechnipFMC, the successor to FMC, is a public liability company registered under the laws of England and Wales with a United States headquarters in Houston, Texas.  Id. ¶ 2.

B.  PCA And FMC Begin Relationship

In or about July 2008, FMC approached PCA to assist FMC in reducing inefficiencies and costs in its quality control programs.  Id. ¶ 23.  On December 3, 2008, the parties executed a Master Service and License Agreement ("2008 MSLA") in which PCA agreed to license its materials to certain FMC employees for the purpose of educating them in methods of quality improvement and management.  Id.  On May 26, 2009, the parties executed a second Master Service and License Agreement ("2009 MSLA") for the purpose of extending the license of PCA's proprietary materials and processes to a separate FMC division.  Id. ¶ 24.  Both agreements provided for a separate service and license fee for each FMC employee trained in a

PCA program, and restricted FMC's ability to use PCA materials without prior approval and consent.  Id. ¶¶ 23-24.

In 2009, FMC created and launched "Impact Quality," an internal communications program based on PCA's "Absolutes of Quality."  Id. ¶ 25.  In 2011, PCA helped the FMC executive team update the "FMC Core Values," specifically incorporating language from the "Absolutes of Quality" and key PCA concepts.  Id. ¶ 26.  PCA alleges that this provision of quality management materials and processes continued to outgrow the division-specific, limited uses set forth in the 2008 and 2009 MSLAs.  Id. ¶ 27.

C.  PCA And FMC Execute The 2014 License Agreement

On or about January 1, 2014, PCA and FMC executed the 2014 License Agreement, which provides FMC with an "enterprise-wide, non-exclusive, non-transferable, perpetual right and license to use the materials specified" in the 2014 License Agreement.  Docket No. 1-1 at 4; see Compl. ¶¶ 28-29.  It allowed FMC to reproduce the licensed PCA materials in any format or medium and embed PCA's methods and tools into its own business processes without restriction.  Compl. ¶ 29.  Unlike the 2008 and 2009 MSLAs, the 2014 License Agreement permitted any FMC employee, temporary employee or contractor to use PCA materials to perform their job duties.  Id.

Given these "expansive rights," the 2014 License Agreement includes several provisions designed to adequately protect FMC's use of the materials.  Id. ¶ 30.  In particular, the 2014 License Agreement specifies the rights and obligations of the parties in the event of a "Change of Control," which includes a "consolidation or merger of [FMC] into or with any other entity or entities."  Id. ¶ 36; Docket No. 1-1 at 7.  In the event of a "Change of Control," PCA had the

right to terminate the Agreement upon written notice to FMC, and the "newly controlling entity" was required to obtain PCA's prior written consent before using the licensed materials.  Id.

In addition, Section 2 of the 2014 License Agreement provides that the PCA marks are PCA-owned trademarks that FMC could use solely for its own internal business purposes. Compl. ¶¶ 15-16; Docket No. 1-1 at 2.  Section 11 sets forth a procedure for resolving disputes arising out of or relating to the 2014 License Agreement, which contemplates that the parties use their best efforts to resolve such disputes up to the level of each party's President or CEO. Compl. ¶ 75; Docket No. 1-1 at 7.  Section 12(v) provides PCA with the right, upon reasonable prior notice, to conduct an audit "reasonable in scope of [FMC's] relevant activities, books and records solely for the purpose of confirming compliance with the use restrictions of [the] Agreement."  Compl. ¶ 71; Docket No. 1-1 at 8.

FMC allegedly used its expanded rights under the 2014 License Agreement to embed PCA's materials and processes throughout the company, and even put the materials on a corporate server accessible to all FMC employees.  Compl. ¶¶ 31-32.  PCA alleges that by 2016, nearly a thousand FMC executives and managers were provided with PCA materials and had attended one or more PCA workshops and trainings.  Id. ¶¶ 34-35.

> D.     FMC Merges With Technip S.A.

On or about May 19, 2016, FMC announced its intention to merge with Technip S.A., a company that provided project life cycle services for clients in the energy industry.  Id. ¶ 37. The merger was consummated in or about January 2017 and resulted in the creation of defendant TechnipFMC.  Id. ¶ 39.

PCA alleges that the merger constituted a "Change of Control" under the 2014 License Agreement.  Id. ¶ 40.  PCA also alleges that, following the merger, TechnipFMC continued to

use the licensed materials without obtaining written consent.  Id. ¶¶ 42-43.  PCA claims that

TechnipFMC availed itself of the materials to integrate them into the business processes of the

new company.  Id. ¶ 44.  To date, TechnipFMC employees allegedly continue to use the Impact

Quality name in both internal and external communications, and PCA modified works both

internally and on the TechnipFMC public website.  Id. ¶ 45.

       E.       PCA And TechnipFMC Discuss
                Prospect Of New License Agreement

In or about November 2016, PCA executives, including principal Kevin Weiss, met with

Mark Scott, the Executive Vice President responsible for TechnipFMC "Quality," in Houston,

Texas to discuss the implications of the merger.  Id. ¶¶ 46-47.  At the meeting, Scott allegedly

acknowledged that TechnipFMC needed a license to use PCA's materials.  Id. ¶ 47.  Scott also

disclosed that Doug Pferdehirt, the new CEO of TechnipFMC, intended to staff key quality

positions within the new company with former FMC managers.  Id. ¶ 46.  In addition,

TechnipFMC requested a proposal to continue and extend the license to cover its employees.  Id.

¶ 48.

After the meeting, PCA proposed several new agreements based on the amounts FMC

had paid under the 2014 License Agreement.  Id. ¶ 49.  PCA specifically proposed options for

FMC to purchase both a license and bundle of services, with fees ranging between $5 and $12

million.  Id.

TechnipFMC representatives traveled to Boston to further negotiate the license fee

structure.  Id. ¶ 51.  They indicated that completion of a new contract with PCA was "urgent"

given TechnipFMC's need to create an integrated quality program.  Id.  PCA alleges that the

representatives said it was unfair that due to the merger, they could not continue to use the

materials without further payment.  Id.  Another TechnipFMC representative allegedly indicated

that the company needed a new agreement to avoid incurring the cost of removing all PCA materials, which he estimated would be millions of dollars due to the pervasive use of the materials across the company.  Id. ¶ 52.

After "extensive" negotiation, PCA presented TechnipFMC with a framework for a more limited scope of licensed materials at a cost of approximately $3 million, which TechnipFMC rejected.  Id. ¶¶ 53-54.

In or about March 2017, Weiss wrote a letter to Pferdehirt requesting a meeting to discuss the parties' outstanding issues.  Id. ¶ 54.  PCA maintains that this letter also sought to remind TechnipFMC that, as a result of the merger, it did not have the right to use the licensed materials. Id.  Pferdehirt did not respond to the letter.  Id.  Instead, Scott reached out to PCA and advised it that going forward, negotiations for the new license agreement should proceed through him.  Id. ¶ 55.

F.    The 2017 Email Exchange

On May 11, 2017, after a series of direct negotiations between Weiss and Scott, Weiss sent Scott an email with the subject line "Good News."  Id. ¶ 56; see Docket No. 1-2 at 2-4.  The email summarized Weiss' understanding of the negotiations, which included TechnipFMC receiving the right to use the PCA materials for $2.3 million.  Compl. ¶ 56; Docket No. 1-2 at 3. Payments would consist of a $500,000 license fee, paid upon contract signing, and $1.8 million for services, paid over two years.  Id.  Weiss indicated that if his understanding as summarized was correct, TechnipFMC "[could] agree to the basic structure."  Docket No. 1-2 at 3.  In order to "smooth out the cash flows," however, Weiss proposed adjusting the payment schedule. Compl. ¶ 56; Docket No. 1-2 at 3.  He requested that Scott acknowledge the email and indicate whether PCA would "agree to the adjusted schedule so [that the parties could] proceed with next

steps." Id. ¶ 57; Docket No. 1-2 at 3.  Given the "existing contract structure," Weiss stated that

he did not anticipate that it would take "much time to close the deal."  Id.  Weiss also indicated

that he had designated a separate PCA employee to both "update the agreement" and work with

TechnipFMC's designee.  Id.  In closing, Weiss stated that he looked forward to "signing the

contract so [the parties could] get to work!"  Id.

On May 12, 2017, Scott responded to Weiss' email stating, "[i]t appears we have a deal."

Compl. ¶ 58; Docket No. 1-2 at 2.  With respect to the proposed payment schedule, Scott

expressed his certainty that the parties could "agree to an easy and accurate way to track, to be

fair to all."  Id.  On the email, Scott copied a different PCA employee, Andrew Cort, who would

be responsible on PCA's end for "finaliz[ing]" the "legal 'mumbo-jumbo.'"  Id.  In addition,

Scott expressed his happiness that the parties had "reached an agreement to continue working"

together and hoped the relationship would continue "for a long time."  Id.

Through the 2017 email exchange, PCA maintains that the parties had "reached

agreement."  Id. ¶ 59.  PCA claims that TechnipFMC never intended to live up to its "obligations

under the new agreement," and instead sought to continue to use the licensed materials without

payment.  Id.

G.  TechnipFMC Decides To Part Ways With PCA

TechnipFMC allegedly continued to misrepresent its intention to execute the new

agreement so that PCA would rely on the representations and not insist on the return of its

intellectual property.  Id. ¶¶ 60-61.  In particular, on August 4, 2017, Cort allegedly indicated

that if PCA removed other language that it had suggested, TechnipFMC was prepared to sign the

"written contract with [the] proposed Change of Control language."  Id. ¶ 62.  On August 10,

2017, PCA sent TechnipFMC a revised version of the agreement.  Id.

PCA maintains that TechnipFMC continued to delay formal execution of the agreement, citing various excuses.  Id. ¶ 63.  On October 19, 2017, given TechnipFMC's continued delay, PCA resent the contract with revisions tracking TechnipFMC's August 4th request.  Id. ¶ 64. The parties continued to exchange messages, and each time, TechnipFMC allegedly represented that it was "reviewing" the language and would respond.  Id. ¶ 65.

On November 28, 2017, Scott sent Weiss an email thanking PCA for its "patience in these past months as [TechnipFMC had] worked to define [the parties'] business relationship going forward."  Id. ¶ 66.  Scott stated that TechnipFMC had decided that it would not be executing a revised license agreement and instead was "prepared to move forward on [its] own with [its] quality transformation."  Id.  Scott represented that TechnipFMC "[didn't] see any value in executing a license agreement."  Id.  Scott further indicated that TechnipFMC would "begin the process of destroying all licensed PCA materials."  Id. ¶ 67.

From January 2017, when the merger closed, to November 28, 2017, PCA alleges that TechnipFMC continued to possess and use the licensed materials in its business operations without PCA's prior written consent, and, in so doing, obtained the benefit of such use, while prolonging the negotiation over a new license agreement.  Id. ¶ 68.  PCA submits that TechnipFMC continues to incorporate the licensed materials into its quality management processes and business operations in violation of its predecessor's obligations to preserve the confidentiality of those materials.  Id. ¶¶ 69-70.

H.  PCA Seeks To Invoke Audit
     And Dispute Resolution Procedures

On November 30, 2017, PCA sent Scott a letter invoking its rights under the 2014 License Agreement to conduct an audit of FMC and TechnipFMC's relevant activities, books

and records in order to evaluate the propriety of their use of the licensed materials.  Id. ¶ 71.
TechnipFMC confirmed receipt of the letter but did not otherwise respond.  Id. ¶ 72.

PCA maintains that in subsequent correspondence it repeatedly invoked its audit right, to
no avail.  Id. ¶¶ 73-74.  Instead, TechnipFMC offered to make a single employee of its own
choosing available to answer PCA's questions.  Id. ¶ 74.

As a result, on February 23, 2018, PCA sent TechnipFMC a letter invoking the dispute
resolution procedure set forth in the Agreement.  Id. ¶ 75.  PCA specifically requested a meeting
between Weiss and the President or CEO of TechnipFMC, in a good faith effort to resolve the
audit dispute.  Id. ¶ 76.  TechnipFMC did not respond to this letter.  Id. ¶ 77.

III.    STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556
U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A
claim has facial plausibility when the plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.
(citation omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it
asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.  (citation
omitted).

In assessing the sufficiency of the complaint, "an inquiring court first must separate
wheat from chaff; that is, the court must separate the complaint's factual allegations (which must
be accepted as true) from its conclusory legal allegations (which need not be credited)."
Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514 (1st Cir. 2016) (citing Morales-Cruz v. Univ. of
P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  The court must then determine "whether the well-

pleaded facts, taken in their entirety, permit 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (citation omitted).

Where, as here, the plaintiff makes allegations of fraud, those allegations must comply with Rule 9(b) of the Federal Rules of Civil Procedure.  Pursuant to Rule 9(b), a party must state "with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Rule 9(b) requires that a plaintiff's averments of fraud specifically plead the time, place and content of the alleged false representation.  Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 22 (1st Cir. 2017).  The purpose of this requirement is to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery."  Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996).

However, the "specificity requirement extends only to the particulars of the allegedly misleading statements itself," not to intent and knowledge, nor to the circumstances of the plaintiff's conduct in reliance on the allegedly misleading statements.  O'Hara v. Diageo-Guinness, USA, Inc., 306 F. Supp. 3d 441, 462 (D. Mass. 2018) (citing Rodi v. S. New England Sch. Of Law, 389 F.3d 5, 15 (1st Cir. 2004)).[4]  "[I]ntent and knowledge[] may be averred in general terms."  In re Zofran (Ondansetron) Prods. Liab. Litig., No. 15-md-2657-FDS, 2017 WL 1458193, at *4 (D. Mass. Apr. 24, 2017) (citing Rodi, 389 F.3d at 15).

The First Circuit has interpreted Rule 9(b)'s particularity requirement to apply not only to actual fraud claims but also to "associated claims where the core allegations effectively charge

---

[4] The 2014 License Agreement has a Massachusetts choice-of-law provision, Docket No. 1-1 at 7, and both parties have cited to Massachusetts law in their papers.  Where the parties have agreed as to the choice of law, courts are "free to 'forego an independent analysis and accept the parties' agreement.'"  Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003) (citation omitted).

fraud." <u>N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 15 (1st Cir. 2009) (citation omitted). Accordingly, a plaintiff bringing a Chapter 93A claim must comply with Rule 9(b) and specify the "time, place, and content" of any allegedly false representations that form the basis for such claim. <u>O'Hara</u>, 306 F. Supp. 3d at 450.

IV.    <u>SCOPE OF THE RECORD</u>

In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings and documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken. See <u>Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.</u>, 524 F.3d 315, 321 (1st Cir. 2008) (citing Fed. R. Civ. P. 10(c)). If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d).

However, "[u]nder certain 'narrow exceptions,' some extrinsic documents may be considered without converting a motion to dismiss into a motion for summary judgment." <u>Freeman v. Town of Hudson</u>, 714 F.3d 29, 36 (1st Cir. 2013) (citing <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993)). "These exceptions include documents the authenticity of which are not disputed by the parties; official public records; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint." <u>Id.</u> (internal quotations, modifications, and citations omitted). Accordingly, if "a complaint's factual allegations are expressly linked to— and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." <u>Trans-Spec Truck Serv., Inc.</u>, 524 F.3d at 321 (quoting <u>Beddall v. State St. Bank & Trust Co.</u>, 137 F.3d 12, 16-17 (1st Cir. 1998)).

Here, TechnipFMC has submitted, as part of its motion to dismiss, a separate declaration attaching a total of four emails and letters.  Docket Nos. 10; 10-1; 10-2; 10-3; 10-4.  TechnipFMC maintains that these "additional background materials" are communications between the parties that provide context and are "central" to the issues raised in the complaint.  Docket No. 9 at 13 n.2.  PCA objects to this Court's consideration of the documents.  Docket No. 15 at 21-23 & n.7.  The documents do not meet any of the exceptions for considering information outside of the pleadings in the context of a Rule 12(b)(6) motion, and the undersigned therefore declines to consider them, or any argument based on their contents, for purposes of this report and recommendation.[5]

V.      DISCUSSION

    A.      Breach Of Contract And Unjust
           Enrichment Claims (Counts I, III, IV, IX)

The complaint alleges that TechnipFMC breached the "Executory Amended and Restated License Agreement," i.e., the 2017 email exchange between Mark Scott and Kevin Weiss.  Compl. ¶¶ 78-82.  PCA also alleges that TechnipFMC breached the implied covenant of good faith and fair dealing by failing to execute a written document memorializing the terms agreed upon in that email exchange.  Id. ¶¶ 94-99.  PCA further alleges that TechnipFMC breached the 2014 License Agreement by (1) communicating and using the licensed materials following a Change of Control without prior written consent; (2) refusing to allow PCA to conduct an audit;

---

[5] In order to consider the materials, TechnipFMC suggests, in the alternative, that the court convert its motion into one for summary judgment.  Docket No. 9 at 13 n.2.  Such conversion is discretionary.  Buck v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007).  "The wiser course is to allow the parties to engage in discovery, to see if the parties are able to narrow the factual disputes."  Levecque v. Argo Mktg. Grp., Inc., No. 2:14-cv-00218-JAW, 2015 WL 10044258, at *7 (D. Me. Feb. 25, 2015) (citation omitted).  Accordingly, this Court declines to recommend that the District Judge convert the instant motion into one for summary judgment.

and (3) failing to respond to PCA's request for a dispute resolution meeting.  Id. ¶¶ 83-90.

Alternatively, PCA alleges that it is entitled to damages for unjust enrichment.  Id. ¶¶ 141-46.

### 1.  Counts I And IX: Copyright Preemption

As a preliminary matter, TechnipFMC argues that to the extent the breach of the 2014

License Agreement and unjust enrichment claims are predicated on TechnipFMC's use of PCA's

copyrighted materials, such claims are preempted by federal copyright law.  Docket No. 9 at 12,

17.

Section 301(a) of the Copyright Act preempts any state cause of action that is equivalent

to a federal copyright infringement claim.  17 U.S.C. § 301(a).  The rights protected under the

Copyright Act include reproduction, preparation of derivative works, distribution and display.

17 U.S.C. § 106.  A state law claim is preempted if the work involved falls within the subject

matter of the copyright and the state law claim incorporates no extra element that is qualitatively

different from the copyright claim.  Ivymedia Corp. v. iLIKEBUS, Inc., No. 15-11918-NMG,

2015 WL 4254387, at *6 (D. Mass. July 13, 2015) (citing Steele v. Turner Broad. Sys., Inc., 607

F. Supp. 2d 258, 263 (D. Mass. 2009)).  A state law claim is not preempted if that cause of action

requires an extra element, "beyond mere copying, preparation of derivative works, performance,

distribution or display" because such cause of action is qualitatively different from, and not

subsumed within, a copyright infringement claim.  Micro Focus (US), Inc. v. Genesys Software

Sys., Inc., No. CIV. A. 14-14049-NMG, 2015 WL 1523606, at *3 (D. Mass. Apr. 3, 2015)

(citing Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1164 (1st Cir. 1994),

abrogated on other grounds by, Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010)).

"A majority of courts to address the issue have found that claims for breach of contract in

the software licensing context are not preempted by the Copyright Act."  Micro Focus (US), Inc.,

2015 WL 1523606, at *3 (collecting cases).  "The Eighth Circuit Court of Appeals has explained, for example, that a contractual restriction on the use of a licensed software program constitutes 'an extra element . . . making [the] cause of action [under contract law] qualitatively different from an action for copyright.'"  Id. (quoting Nat'l Car Rental Sys., Inc. v. Comput. Assocs. Int'l, Inc., 991 F.2d 426, 431 (8th Cir. 1993)).

Here, PCA's claim for breach of the 2014 License Agreement requires a valid license agreement pursuant to which the defendant needed to obtain consent for its continued use of the product.  PCA's claims for breach of the audit and dispute resolution provisions of the 2014 License Agreement require a valid license agreement pursuant to which PCA may conduct a reasonable audit of the defendant's books and records and the parties must follow a specified procedure for resolving disputes arising under the agreement.  These claims, therefore, require elements beyond those for a copyright infringement claim.  Accordingly, count II is not preempted by the Copyright Act.

Unjust enrichment claims, when based on the same allegations as a copyright claim, are preempted.  Feldman v. Twentieth Century Fox Film Corp., 723 F. Supp. 2d 357, 368 (D. Mass. 2010) (citing Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 104-05 (D. Mass. 2001)) (other citations omitted).  Insofar as it applies to copyrightable subject matter, an unjust enrichment claim that essentially repackages a copyright infringement claim by adding the allegation that the defendant unjustly received some benefit is preempted.  See Tingley Sys., Inc., 152 F. Supp. 2d at 112.

Here, PCA maintains that its licensed materials include "proprietary techniques and approaches" that are not copyrightable subject matter.  Docket No. 15 at 26 (citing 17 U.S.C. § 102(b)).  Therefore, PCA submits that its unjust enrichment claim is not preempted because it

does not exclusively seek recovery for the unauthorized use of copyright protected materials.  Id. However, the corollary to this argument is also true.  In other words, to the extent PCA's unjust enrichment claim depends on TechnipFMC's alleged use of materials that are protected by copyright, that part of the claim is preempted.  Accordingly, this Court recommends that the District Judge dismiss that portion of the unjust enrichment claim that pertains to use of PCA's licensed materials that are subject to copyright protection.

### 2.   Counts I And III: 2017 Email Exchange

TechnipFMC argues that counts I and III must fail because the 2017 email exchange did not form a valid contract between the parties.  Docket Nos. 9 at 8-10, 15-17; 19 at 2-4, 7.   In the event the 2017 email exchange did create an enforceable contract, TechnipFMC submits that PCA has not adequately alleged bad faith and therefore has not stated a claim for breach of the implied covenant of good faith and fair dealing.  Docket Nos. 9 at 15-17; 19 at 7.

In order to prove a breach of contract claim, the plaintiff must demonstrate that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff[] sustained damages as a result of the breach."  Brooks v. AIG Sunamerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) (citation omitted).

To create an enforceable contract, "there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."  Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000) (citations omitted).  "[T]he fact that parties contemplate the execution of a final written agreement effects a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled."  TLT Const. Corp. v. RI, Inc., 484 F.3d 130, 135 (1st Cir. 2007) (citing Rosenfield v. U.S. Trust Co., 290 Mass. 210, 215-16 (1935); McCarthy v. Tobin, 429

16

Mass. 84, 87-88 (1999)).  "Where there is an 'agreement to agree' on an essential term of a contract, there is no contract to enforce." Laudano v. 214 S. St. Corp., 608 F. Supp. 2d 185, 194 (D. Mass. 2009) (quoting Cousin v. Sofono, Inc., No. 01-30186-MAP, 2003 WL 22391233, at *6 (D. Mass. Oct. 17, 2003)).

"If, however, the parties orally agree to the essential terms of the transaction, it may be inferred that they intended to bind themselves at that time and that the 'writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms.'" TLT Const. Corp., 484 F.3d at 135 (citations omitted).  The intent of the parties is generally a question of fact because the determination of whether parties intended to be bound must be premised on the totality of all such expressions and deeds given the attendant circumstances and the objectives of the parties. Sinotau Pharm. Grp. v. Navidea Biopharmaceuticals, Inc., 211 F. Supp. 3d 375, 379 (D. Mass. 2016).

"It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." Situation Mgmt. Sys., Inc., 430 Mass. at 875.  "The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'" Id. (citations omitted).

The covenant of good faith and fair dealing is implied in every contract. Smyth v. Am.'s Servicing Co., C.A. No. 14-13472-MLW, 2017 WL 1190374, at *11 (D. Mass. Mar. 30, 2017) (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 237 (1st Cir. 2013)).  However, "the concept of good faith is shaped by the nature of the contractual relationship from which the implied covenant derives, and the scope of the covenant is only as broad as the contract that governs the particular relationship." Id. (quoting MacKenzie v. Flagstar Bank, FSB, 738 F.3d 486, 493 (1st Cir. 2013)) (internal punctuation omitted).  "Usually, a breach of the implied

covenant involves 'bad faith' conduct 'implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of fraud.'"  Targus Grp. Int'l, Inc. v. Sherman, 76 Mass. App. Ct. 421, 435 (2010) (collecting cases).  Further, the covenant of good faith and fair dealing governs the conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached.  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 230 (1st Cir. 2005).

a.    Breach Of The 2017 Email Exchange

Here, the parties emphasize different parts of the 2017 email exchange to illustrate their opposing views.  TechnipFMC argues that PCA principal Kevin Weiss' statements that someone at PCA needed to "update the agreement" and take additional steps so that the parties could "get to work" reflect an imperfect negotiation rather than a completed contract.  Docket No. 9 at 9-10.

PCA maintains that TechnipFMC Executive Vice President Mark Scott's email "contains all the hallmarks of a present intent to be bound."  Docket No. 15 at 13-17.  PCA emphasizes that Scott specifically stated "[i]t appears we have a deal" and then appointed a subordinate individual to deal with the "legal 'mumbo jumbo'" because he did not feel it necessary to be involved with merely finalizing the agreement.  Id.

For purposes of a motion to dismiss, the complaint adequately alleges an intent to be bound.  It describes parties with a long-standing business relationship that had negotiated specific deal terms in order to continue that relationship, but ultimately decided not to.  Cf. TLT Constr. Corp., 484 F.3d at 136 (stating that "[t]here is no surer way to find out what parties meant, than to see what they have done").  While TechnipFMC maintains that the 2017 email exchange reflects that the parties explicitly contemplated a later written contract with materials terms still unresolved, at this stage of the case, the undersigned must draw all reasonable

18

inferences in PCA's favor.  Accordingly, this Court finds that PCA has sufficiently alleged, for purposes of the motion to dismiss, that the 2017 email exchange created an enforceable contract that TechnipFMC breached.

> **b.**     Breach Of The Implied Covenant Of Good Faith And
> Fair Dealing With Respect To The 2017 Email Exchange

With respect to count III, TechnipFMC repeats the same arguments it made in connection with count I but adds that PCA has not adequately alleged a breach of the implied covenant of good faith and fair dealing.  Docket Nos. 9 at 15-17; 19 at 7.

PCA has plausibly alleged that TechnipFMC acted with the requisite "bad faith" to sufficiently state a claim.  During negotiations, PCA alleges that TechnipFMC described the situation as urgent and expressed that it was unfair that it could not continue to use the licensed materials while the terms of a new agreement were being finalized.  Compl. ¶ 51.  Against this backdrop, when the parties got to a point where they were discussing specific deal terms, on May 12, 2017, Scott expressed his happiness that the parties had "reached an agreement to continue working" together.  Id. ¶ 58; Docket No. 1-2 at 2.  Six months later, however, TechnipFMC decided to "move forward on [its] own."  Compl. ¶ 66.  Thus, from January 2017 until November 2017, the complaint alleges that TechnipFMC prolonged the negotiation of a new agreement in order to obtain the benefit of cost-free access to the licensed materials.  Id. ¶ 68. Such allegations give rise to an inference of bad faith conduct sufficient to withstand dismissal of the implied covenant claim.

Accordingly, the undersigned recommends that the District Judge deny the motion with respect to counts I and III.

3.      Count II: 2014 License Agreement

PCA alleges that TechnipFMC breached the 2014 License Agreement by (1) communicating and using the licensed materials following a Change of Control without prior written consent; (2) refusing to allow PCA to conduct an audit; and (3) failing to respond to PCA's request for a dispute resolution meeting.  Compl. ¶¶ 83-93.

a.      Continued Use And Change Of Control

TechnipFMC contends that PCA merely speculates that TechnipFMC continued to use the PCA materials following the merger, and such conclusory allegations are not plausible. Docket Nos. 9 at 11-12; 19 at 4-5.[6]

The complaint describes a sequence of events that gives rise to a reasonable inference that TechnipFMC continued to use the materials after the merger.  The complaint first describes the extent to which the PCA materials permeated the FMC business prior to the merger.  See, e.g., ¶¶ 26, 27, 29, 32, 35, 52.  Nearly one thousand top FMC executives and managers attended a PCA event and had received materials.  Id. ¶ 35.  A TechnipFMC representative allegedly estimated that due to FMC's pervasive use of the PCA materials across the company, it would cost millions to disentangle those materials from TechnipFMC.  Id. ¶ 52.  During the negotiations, moreover, TechnipFMC purportedly represented the urgency of a deal and expressed its view that it was unfair that it could not continue to use the materials without further payment.  Id. ¶ 51.

---

[6] TechnipFMC does not appear to dispute that the 2014 License Agreement was a valid contract; the merger between Technip S.A. and FMC constituted a "Change of Control" under the Agreement; and TechnipFMC did not seek prior written consent from PCA to continue to use any licensed materials.

PCA also expressly alleges that, after the merger, TechnipFMC continued to use programs based on PCA's marks and modified works without consent.  Id. ¶¶ 42-43, 45.  It was not until over one year after the merger that TechnipFMC first stated that it would "begin the process of destroying all licensed PCA materials. . . ."  Id. ¶ 67.  PCA alleges that TechnipFMC continues to use PCA modified works on its public website.  Id. ¶ 45.  Taken together, these allegations support the reasonable inference that after the merger, TechnipFMC continued to internally use the PCA materials without consent, and in so doing, breached the Change of Control provision of the 2014 License Agreement.

### b.   Audit And Dispute Resolution Procedures

TechnipFMC submits that the audit and dispute resolution claims are not ripe because it has not altogether refused to participate in either procedure and instead has objected to PCA's unreasonable approach in invoking those procedures.  Docket Nos. 9 at 12-15; 19 at 5-7.

PCA has plausibly alleged that TechnipFMC has not participated in its reasonable audit and dispute resolution requests and therefore has breached those provisions of the Agreement.  See, e.g., Compl. ¶¶ 71-77.  TechnipFMC's arguments regarding reasonableness are not properly at issue on a motion to dismiss.  "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."  Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F. 3d 33, 45 (1st Cir. 2013) (citation omitted) (emphasis in original).  Indeed,

> [a]t these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations.  Instead, we may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether [the] allegations may prove deficient at the summary judgment or later stages.

Id.  The issue of reasonableness of PCA's request cannot be determined on a motion to dismiss.[7] Here, the complaint adequately alleges facts that, if proven true, would support a finding that TechnipFMC breached Sections 11 and 12(v) of the 2014 License Agreement.

For these reasons, the undersigned recommends that the District Judge deny the motion to dismiss with respect to count II.

### 4.    Count IX: Unjust Enrichment

TechnipFMC argues that the complaint makes no plausible allegation that it received any benefit from PCA.  Docket Nos. 9 at 17-18; 19 at 8.

For a party to prevail on a claim for unjust enrichment under Massachusetts law, there must be "unjust enrichment of one party and unjust detriment to another party."  Mass. Eye & Ear Infirmary, 552 F.3d at 57 (citations omitted).  Unjust enrichment requires: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value.  Id.  Without proof of a benefit, it is not necessary to analyze the remaining elements of unjust enrichment.  See, e.g., Kerr v. Vince, No. 07-30021-MBB, 2010 WL 1416511, at *19 (D. Mass. Apr. 1, 2010).

Here, the complaint alleges that PCA's materials enable clients to achieve "substantial cost savings," Compl. ¶ 13, and the parties had negotiated a $2.3 million payment for TechnipFMC's right to use the PCA materials.  Id. ¶ 56; Docket No. 1-2 at 3.  As discussed above, the complaint plausibly alleges that TechnipFMC continued to use those materials without paying for them.  See supra section V.A.3.a.  Accordingly, the complaint plausibly

---

[7] Indeed, to support its reasonableness argument, TechnipFMC has attached additional materials outside the pleadings.  As discussed above, this Court has determined that they may not be considered on a motion to dismiss.

alleges that TechnipFMC received the benefit of more than nine months of cost-free use of the PCA licensed materials.  Thus, to the extent such claim concerns materials that fall outside federal copyright protection, see supra section V.A.1, PCA has sufficiently alleged that TechnipFMC used the licensed materials at PCA's expense, which constitutes unjust enrichment. Accordingly, the undersigned recommends that the District Judge allow PCA to proceed on both its breach of contract and unjust enrichment claims at this stage of the case, except for the preempted portion of the unjust enrichment claim discussed above.

B.      Fraud Claims (Counts IV And V)

PCA alleges that between the May 2017 email exchange and November 28, 2017, TechnipFMC made a series of intentional and fraudulent representations that led PCA to believe TechnipFMC would execute a written contract.  Compl. ¶¶ 100-07.  PCA also alleges that during this time, TechnipFMC's conduct constituted unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 11.  Id. ¶¶ 108-17.

1.      Count IV: Fraud/Intentional Misrepresentation

TechnipFMC argues that the allegations of fraud/intentional misrepresentation are implausible because the complaint reflects normal business communications of a newly formed company developing its strategy.  Docket Nos. 9 at 18-20; 19 at 8-9.  TechnipFMC also maintains that the complaint certainly does not meet the heightened pleading standard applicable to fraud claims pursuant to Rule 9(b).  Id.

To state a claim of fraud under Massachusetts law, the plaintiff must show that the defendants "made a false representation of a material fact with knowledge of its falsity for purposes of inducing the plaintiff to act thereon, and that the plaintiff actually relied on the

representation." Platten v. HG Bermuda Exempted, Ltd., 437 F.3d 118, 132 (1st Cir. 2006)

(citing Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703-04 (1975)).[8]

Here, the complaint sufficiently alleges (1) the time period that TechnipFMC made the

representations, i.e., May 12, 2017 through November 28, 2017, Compl. ¶¶ 104; (2) the content

of those representations, id. ¶¶ 58-68; and (3) why they are alleged to be false, i.e., because

TechnipFMC "had no intention of executing a written contract."  Id. ¶ 105.  PCA also alleges

that it relied on these representations to its detriment.  Id. ¶¶ 106-07.  PCA has adequately

alleged that TechnipFMC benefitted from its delay in executing the agreement because it used

PCA's work product without payment.  PCA has therefore adequately pleaded the content, time

and place of the allegedly false representations, and stated a claim for fraud/intentional

misrepresentation that satisfies the requirements of Rule 9(b).  This Court recommends that the

District Judge deny the motion to dismiss count IV.

### 2.    Count V: M.G.L. c. 93A, § 11

TechnipFMC argues that the complaint does not plausibly allege that it was dishonest

and/or deceptive in the contract negotiation process, and therefore fails to state a claim under

Chapter 93A.  Docket Nos. 9 at 20-22; 19 at 8-9.[9]

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or

commerce."  M.G.L. c. 93A, §2(a).  A successful claim under Chapter 93A requires a showing of

---

[8] Under Massachusetts law, the elements of a misrepresentation claim are essentially the same as those of a fraud claim.  See Platten, 437 F.3d at 132 (For a claim of misrepresentation, the plaintiff must show that the defendants (1) made false statements of material fact (2) to induce the plaintiff to settle the copyright claims, and (3) that the plaintiff reasonably relied on those statements to his detriment.)

[9] TechnipFMC originally contended that PCA had not alleged that the acts on which it bases its Chapter 93A claim occurred primarily and substantially in Massachusetts.  Docket No. 9 at 21-22.  However, at oral argument, TechnipFMC's counsel stated that it was no longer pursuing that argument in connection with its motion to dismiss.

(1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the plaintiff, and (3) a causal connection between the defendant's deceptive act or practice and the plaintiff's injury.  Casavant v. Norwegian Cruise Line, Ltd., 76 Mass. App. Ct. 73, 76 (2009), aff'd, 460 Mass. 500 (2011); Hershenow v. Enterprise Rent-A-Car Co. of Bos., Inc., 445 Mass. 790, 797 (2006)).  "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'"  Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (citation omitted).  "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law."  Id. at 54 (quoting Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996)).

It is well settled that "a simple, or even intentional, breach [of contract] is insufficient in itself to constitute an unfair or deceptive trade practice under Chapter 93A."  City of Revere v. Bos./Logan Airport Assocs., LLC, 416 F. Supp. 2d 200, 208 (D. Mass. 2005) (citations omitted); see also Mass. Employers Insur. Exchange v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995).  In order to transform a breach of contract into a Chapter 93A claim, "the breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party."  City of Revere, 416 F. Supp. 2d at 209 (citation omitted).  "[T]he theme of the cases in which a breach of contract has amounted to a 93A violation is 'the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid flavor of unfairness.'"  Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 9 F. Supp. 2d 49, 68-69 (D. Mass. 1998) (citations omitted).

Massachusetts courts have consistently held that "conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes." Arthur D. Little, Inc., 147 F.3d at 55 (citing Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991)).  In those cases where courts have found Chapter 93A violations arising out of a breach of contract, additional services or advantages were wrestled from the aggrieved party through false promises.  See, e.g., id. at 55-56 (court found 93A liability where defendants "wrongful purpose was to extract a favorable settlement from [plaintiff] for less than the amount [defendant] knew it owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [plaintiff] to sue."); Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 18 (1st Cir. 1985) (customer withheld payment due distributor as leverage in bargaining to receive more product in the future).

Here, PCA alleges that it suffered injuries from, inter alia, TechnipFMC's breach of the 2014 License Agreement.  Compl. ¶¶ 112-13.  The complaint alleges that TechnipFMC represented that it would execute a new license agreement even though it had no intention of actually doing so and neglected to obtain prior written consent under the 2014 License Agreement to use the licensed materials upon a Change of Control.  Id. ¶¶ 42-43, 59-60.  In addition, the complaint alleges that TechnipFMC shared those materials with unauthorized third parties; unnecessarily prolonged the new license negotiations in order to secure the benefit of their continued use; and refused to allow PCA to conduct an audit.  Id. ¶¶ 68-70, 72-74.  As such, the complaint describes a course of dealing calculated to reap the benefit of continued access to PCA's licensed materials without payment.  At this juncture, such conduct raises an inference of deceptive behavior sufficient to overcome a motion to dismiss.  Accordingly, drawing all

reasonable inferences in PCA's favor, as it must, this Court recommends that the District Judge

deny the motion to dismiss count V.

     C.     Intellectual Property Claims (Counts VI, VII And VIII)

PCA alleges that since the merger, TechnipFMC has used the PCA marks without

permission, thereby committing trademark infringement and false designation of origin in

violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).[10]  Compl. ¶¶ 118-33.  PCA also

alleges that TechnipFMC infringed various copyrights by, inter alia, using and/or copying PCA's

licensed materials without prior written consent.  Id. ¶¶ 134-40.

     1.     Count VI And VII: Lanham Act Claims

TechnipFMC argues that the trademark claims should be dismissed because PCA has not

adequately established that TechnipFMC commercially used the PCA marks in a manner that

was likely to cause confusion.  Docket Nos. 9 at 22-23; 19 at 9-10.

"Trademark law seeks to prevent one seller from using the same 'mark' as—or one

similar to—that used by another in such a way that . . . confuses the public about who really

produced the goods (or service)."  DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 605 (1st Cir.

1992).  The three essential elements of a trademark infringement claim are that (1) the claimant

uses and owns a mark; (2) the defendant uses an identical or similar mark in commerce without

---

[10] Section 1114 is commonly known by its public law designation, "Section 32," whereas Section
1125(a) is commonly known by its public law designation, "Section 43(a)."  Section 32 prohibits
the unauthorized reproduction or use in commerce of registered trademarks.  15 U.S.C. § 1114.
Section 43(a) proscribes the use in commerce of words or symbols that misidentify the source or
affiliation of a product or service.  15 U.S.C. § 1125(a).  Although Section 43(a) "prohibits a
broader range of practices than does" Section 32, Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S.
844, 858 (1982), the pertinent provisions of each require a plaintiff to demonstrate a likelihood
of consumer confusion.  See Venture Tape Corp. v. McGills Glass Warehouse, 540 F.3d 56, 61
n.6 (1st Cir. 2008) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 780 (1992)).
Accordingly, this Court analyzes counts VI and VII together.

permission; and (3) there is a likelihood that defendant's mark will confuse the public.

Southgate v. Soundspark, Inc., No. 14-CV-13861-ADB, 2016 WL 1268253, at *3 (D. Mass.

Mar. 31, 2016), aff'd, No. 16-1365, 2017 WL 3374542 (1st Cir. Jan. 4, 2017) (citing Venture

Tape Corp., 540 F.3d at 60).  At a minimum, the complaint must set forth facts "as to who did

what to whom, when, where, and why" with respect to each element.  Ruggers, Inc. v. United

States, 736 F. Supp. 2d 336, 340 (D. Mass. 2010) (citing Educadores Puertorriquenos en Accion

v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004)) (dismissing Lanham Act claim where "use" rested

on vague and conclusory allegation that all defendants used the trademarks at issue).

Federal trademark rights are created by actual "use" of the mark in commerce.  Kusek v.

Family Circle, Inc., 894 F. Supp. 522, 531 (D. Mass. 1995) (citing 15 U.S.C. § 1051).

Concomitantly,

> infringement of a federal trademark right is defined as the unauthorized 'use in
> commerce' of any reproduction, counterfeit, copy or colorable imitation of a
> registered mark on goods or services . . . and/or 'use in commerce' of any word,
> term, or false designation of origin, false or misleading description of fact or false
> or misleading representation of fact, which is likely to cause confusion.

Id. (citing 15 U.S.C. §§ 1114(1)(a) and (b), 1125(a)).  "[U]se in commerce" is defined as the

"bona fide use of a mark in the ordinary course of trade."  15 U.S.C. § 1127 ("Section 45").  For

purposes of Section 45, "a mark shall be deemed in use in commerce . . . on services when it is

used or displayed in the sale or advertising of services and the services are rendered in

commerce. . ."  Id.  Sections 32 and 43(a) "do not even reach an unauthorized use unless it is 'in

connection with any goods or services.'"  Int'l Ass'n of Machinists & Aerospace Workers, AFL-

CIO v. Winship Green Nursing Ctr., 914 F. Supp. 651, 654 (D. Me. 1996), aff'd, 103 F.3d 196

(1st Cir. 1996) (discussing 15 U.S.C. §§ 1114(1)(a), (b); 1125(a)).

28

For both of PCA's theories of recovery under the Lanham Act, TechnipFMC must use the PCA marks as a prerequisite to a finding of trademark infringement.  See Total Petroleum P.R. Corp. v. Landmarks Media, Inc., No. 17-1402 (JAG), 2017 WL 4876288, at *6, 9 (D.P.R. Oct. 27, 2017) (citing I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998)) (other citations omitted).  Without such a showing, the complaint fails to state a plausible Lanham Act claim, "which renders unnecessary an assessment of likelihood of confusion."  Id. at *9 (citation omitted).

PCA alleges that it uses, owns and licenses trademarks which include "Absolutes of Quality Management," "Absolutes of Quality," and the "Price of Nonconformance," in providing products and services to clients.  Compl. ¶¶ 4, 119.[11]  TechnipFMC's Impact Quality program, although based on the trademark "Absolutes of Quality," is an "internal communications program," id. ¶ 25, and allegations that such program was used externally are vague and insufficient to establish commercial use.  The other allegations that TechnipFMC used the PCA materials in dealings with third parties (see id. ¶¶ 69, 131) are likewise not sufficiently specific to constitute a "use in commerce."  PCA has not alleged that TechnipFMC reproduced or used a colorable imitation of the PCA marks in commerce to identify, sell or advertise its own products or services.  Neither has PCA alleged that TechnipFMC sold, advertised or made any false or misleading statements in commerce to identify or pass off its own products or services under the PCA marks, or to identify or pass off PCA products or services as its own.

In sum, the complaint does not allege the kind of continuous and deliberate external use necessary to ground a trademark infringement claim nor does it portray a company holding itself

---

[11] PCA alleges that its marks are distinctive and entitled to trademark protection, Compl. ¶ 129, which TechnipFMC does not appear to dispute for purposes of this motion.

out to the public as somehow affiliated with PCA.  The PCA marks relate to programs aimed at improving a business' internal quality processes, Compl. ¶¶ 10, 13, whereas FMC and Technip S.A.[12] operated in the oil, gas and energy space.  Id. ¶¶ 22, 37.  Even construing the facts as true and drawing all reasonable inferences in PCA's favor, this Court finds that PCA has not alleged sufficiently that TechnipFMC used the marks in commerce.[13]  Accordingly, the Lanham Act claims fail as a matter of law and this Court recommends that the District Judge grant the motion to dismiss with respect to counts VI and VII.

2.      Count VIII: Copyright Infringement

TechnipFMC argues that PCA's claim of copyright infringement fails to satisfy the Rule 12(b)(6) standard because it is no more than a threadbare recital of the elements of that claim. Docket Nos. 9 at 25; 19 at 12.  In addition, TechnipFMC contends that PCA has not sufficiently identified the infringed copyrights because it failed to include the copyright registration numbers in the complaint.  Id.

Copyright law assures authors the right to their original expression while also encouraging others to build freely upon the ideas and information conveyed by a work.  Hassett v. Hasselbeck, 757 F. Supp. 2d 73, 78 (D. Mass. 2010) ("Hassett I").  In other words, "the reader

---

[12] The complaint does not set forth the nature of TechnipFMC's business, just that of predecessor companies, FMC and Technip S.A., which provided project life cycle services for clients in the energy industry.  See Compl. ¶¶ 22, 37.

[13] Notably, the case that PCA cites to support its proposition that the use of a trademark in connection with a different type of good or service can cause confusion actually rejected that argument.  Docket No. 15 at 25-26 (citing WCVB-TV v. Bos. Athletic Ass'n, 926 F.2d 42, 44-46 (1st Cir. 1991)).  There, the First Circuit held that a broadcast channel's use of the words "Boston Marathon" would not confuse the typical viewer that the channel bore the imprimatur of the marathon's organizer.  WCVB-TV, 926 F.2d at 44-46.  "The trademark statute does not give [plaintiffs] any 'property right' in their mark except 'the right to prevent confusion.'"  Id. at 45 (emphasis in original; citation omitted).  Here, PCA has not plausibly alleged that TechnipFMC used the PCA marks in commerce.

of a book is not by the copyright laws prevented from making full use of any information he may acquire from his reading." Eldred v. Ashcroft, 537 U.S. 186, 217 (2003). Along these lines, copyright law protects only the expressions of ideas, and not the ideas themselves. Hassett v. Hasselbeck, 177 F. Supp. 3d 626, 630 (D. Mass. 2016) ("Hassett II"). Pursuant to 17 U.S.C. § 102(b), "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). "The ideas and concepts underlying the expression are free for anyone's taking." Hassett II, 177 F. Supp. 3d at 630 (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349 (1991)).

In order to prevail on its copyright infringement claim, PCA must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." T-Peg, Inc. v. Vt. Timber Works, Inc., 459 F.3d 97, 108 (1st Cir. 2006) (citations omitted).

a.    Ownership

To prove ownership of a valid copyright, a plaintiff must prove that the work is original and that the plaintiff complied with applicable statutory formalities. "The Copyright Act provides that a party cannot sue for copyright infringement until a work has been registered with the U.S. Copyright Office." Calden v. Arnold Worldwide LLC, No. 12-10874-FDS, 2012 WL 5964576, at *3 (D. Mass. Nov. 27, 2012) (citing Feldman, 723 F. Supp. 2d at 364); see 17 U.S.C. § 411(a).[14]  A certificate of copyright constitutes prima facie evidence of ownership. Johnson v.

---

[14] PCA cites the Calden case for the proposition that it need not reference the copyright registration numbers in the complaint nor attach the certificates of registration; instead, it need only allege (in addition to copying), ownership of a valid copyright. Docket No. 15 at 32-33

Gordon, 409 F.3d 12, 17 (1st Cir. 2005) (citing Milene Music, Inc. v. Gotauco, 551 F. Supp. 1288, 1293 (D.R.I. 1982)).  Upon the plaintiff's production of such a certificate, the burden shifts to the defendant to demonstrate some infirmity in the claimed copyright.  Id. (citing CMM Cable Rep, Inc. v. Ocean Coast Props, Inc., 97 F.3d 1504, 1513 (1st Cir. 1996)).

Here, the complaint alleges that PCA has valid, federally-registered copyrights in the published works of Philip Crosby, which include "Quality is Free," "Quality is Still Free," "Quality Without Tears," "The Absolutes of Leadership," and "The Eternally Successful Organization: The Art of Corporate Wellness."  Compl. ¶ 135.  The complaint does not provide the copyright registration numbers for these works.

Specification of copyright registration numbers and descriptions in a complaint is helpful but not required.  See Ivymedia Corp., 2015 WL 4254387, at *5.  If copyrights are referenced adequately in a complaint to enable a relatively easy search, the complaint will survive a motion to dismiss on this basis.  Id.  Such is the case here.[15]  Accordingly, PCA has plausibly alleged ownership of the copyrights it has identified.

---

(citing Calden, 2012 WL 5964576, at *3).  However, Calden explains that the Copyright Act only permits an individual to sue to enforce copyright protection if the work at issue has been registered.  Calden, 2012 WL 5964576, at *3.  The court made no mention of registration numbers.

[15] The United States Copyright Office website establishes that each of the works TechnipFMC has identified are federally registered: "Quality is Free" (registration number TX0000145883); "Quality is Still Free" (TX0004171514); "Quality without Tears" (TX0001328823); "The Absolutes of Leadership" (TX0004416166); and "The Eternally Successful Organization: The Art of Corporate Wellness" (TX0002323191).  United States Copyright Office Public Catalog, https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Crosby+Philip&Search_Code=NALL&PID=I8TNRfEA8Ib27bB7iCgPXDJtDjwd&SEQ=20190812173219&CNT=100&HIST=1 (last visited Aug. 12, 2019).

b.      Copying

For the purposes of federal copyright law, copying is a shorthand reference to the act of infringing any of the copyright owner's exclusive rights set forth at 17 U.S.C. § 106.  Jalbert v. Grautski, 554 F. Supp. 2d 57, 67 (D. Mass. 2008).  Those rights include the rights to reproduce, prepare derivative works and distribute copies of the copyrighted work to the public by sale or other transfer of ownership.  Id.; see 17 U.S.C. § 106.  In order to prove copying of a work's original elements, "[t]he copyright holder first must factually establish, whether via direct or circumstantial evidence, that the alleged infringer copied the protected work."  Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 48 (1st Cir. 2012) (citing Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001)).  Second, "the holder must show that the copying was so flagrantly extreme that the allegedly infringing and copyrighted works were, for all intents and purposes, 'substantially similar.'"  Soc'y of Holy Transfiguration Monastery, Inc., 689 F.3d at 48 (citations omitted).

"Proof of 'both species of copying is essential for the plaintiff to prevail.'"  Id. (citations omitted; alteration in original).  "Thus, if a plaintiff cannot show that factual copying occurred but can show such copying rendered the works substantially similar, his infringement claim will fail; likewise, if a plaintiff satisfies the factual copying prong, but cannot show that such copying produced a substantially similar result, denial of his infringement claim will be warranted."  Id. at 48-49 (citations omitted).  The plaintiff bears the burden of proof to establish wrongful copying.  Calden, 2012 WL 5964576, at *4 (citing Johnson, 409 F.3d at 17).

Where direct proof of actual copying is not available, a plaintiff may satisfy his obligation indirectly by adducing evidence that the alleged infringer enjoyed access to the copyrighted work and that a sufficient degree of similarity exists between the copyrighted work

and the allegedly infringing work to give rise to an inference of actual copying.  Id. (citing

Johnson, 409 F.3d at 18).  "In evaluating such 'probative similarity,' the First Circuit has held

that a court must 'engage in dissection of the copyrighted work by separating its original,

protected expressive elements from those aspects that are not copyrightable because they

represent unprotected ideas or unoriginal expressions.'"  Id. (citing Johnson, 409 F.3d at 18-19).

A court must only address the question of substantial similarity if it identifies any probative

similarity from which it can infer actual copying.  Id. at *5 (citing McGee v. Benjamin, No. 08-

11818-DPW, 2012 WL 959377, at *5 (D. Mass. Mar. 20, 2012)).  Substantial similarity exists

where "a reasonable, ordinary observer, upon examination of the two works, would 'conclude

that the defendant unlawfully appropriated the plaintiff's protectable expression.'"  T-Peg, Inc.,

459 F.3d at 112 (quoting Johnson, 409 F.3d at 18).  Before this comparison can take place, "the

plaintiff must necessarily establish the content of the copyrighted work that it contends was

infringed."  Airframe Sys., Inc. v. L-3 Commc'ns Corp., 658 F.3d 100, 106 (1st Cir. 2011).

　　Here, the complaint alleges that TechnipFMC infringed PCA's copyrights by "using,

reproducing, copying, displaying, and making derivative or modified works from, PCA's

licensed materials."  Compl. ¶ 138.  As discussed above, PCA has plausibly alleged that

TechnipFMC had access to and internally used the licensed materials.  However, other than the

single allegation of reproduction, copying, display and the making of derivative and modified

works, the complaint does not identify any allegedly infringing materials,[16] nor does it attempt to

compare those materials to the copyrighted works.

---

[16] The only program that the complaint expressly identifies that derives from the licensed
materials (that TechnipFMC continues to use) is Impact Quality, and such program is alleged to
derive from the trademark "Absolutes of Quality."  Compl. ¶¶ 25, 45.  The complaint does not
allege that this program derives from any of the copyrighted works.

Copyright law protects only PCA's original expression, and not the general, unoriginal idea and concept of quality.  In the absence of any allegations that identify specific TechnipFMC expressions that infringe the protected portions of PCA's copyrighted works, PCA has not met its burden of demonstrating that TechnipFMC actually copied those works.  PCA submits that TechnipFMC's "unauthorized use" of the PCA copyrights is sufficient to demonstrate TechnipFMC's infringement of those copyrights.  Docket No. 15 at 32.  PCA has cited no persuasive legal authority to support this proposition.[17]  Accordingly, the undersigned recommends that the District Judge dismiss count VIII.

## VI.   RECOMMENDATION

For the foregoing reasons, this Court recommends that the District Judge

(1)     grant the motion to dismiss counts VI, VII and VIII, and that portion of count IX that pertains to PCA's licensed materials that are subject to copyright protection; and

(2)     deny the motion to dismiss counts I, II, III, IV, V, and that portion of count IX that pertains to PCA's licensed materials that are not subject to copyright protection.

## VII.   REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of service of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72.  The parties are further advised that the United States Court

---

[17] Indeed, the Calden case expressly states that a plaintiff must first show that "'as a factual matter, the defendant copied the plaintiff's copyrighted material.'"  Calden, 2012 WL 5964576, at *4 (citing Johnson, 409 F.3d at 18)).

of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge